| | |
|---|---|
| **MICHELE A. PARKER and RANDALL C. PARKER,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **BANK OF AMERICA, N.A.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 34].

## I.     PROCEDURAL BACKGROUND

This action arises from the Plaintiffs' purchase of Lot 542 (the "Lot") in Grey Rock at Lake Lure ("Grey Rock"), a planned resort community in North Carolina.   After meeting with Grey Rock's developer, LR Buffalo Creek, LLC (together with its parent company Land Resource, LLC, "Land Resource") and picking their Lot, the Plaintiffs turned to Bank of America to finance their purchase.   Land Resource failed to complete the infrastructure and amenities in Grey Rock and subsequently became insolvent, leaving the Plaintiffs owning land with a value significantly lower than the original

purchase price.   The Plaintiffs now bring this action against Bank of America, seeking to hold their lender legally responsible for their losses.

The Plaintiffs initially brought suit in one mass action with other borrower-plaintiffs on December 8, 2011, but the Court severed all claims. Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011). The Plaintiffs then refiled an individual Complaint.  Following the Court's Order granting in part and denying in part Bank of America's Motion to Dismiss, only Plaintiffs' claims for fraud and for violations of the Interstate Land Sales Act ("ILSA") and the North Carolina Unfair and Deceptive Trade Practices Act ("Chapter 75") remain.

Bank of America now seeks summary judgment on the Plaintiffs' remaining claims.  For the reasons that follow, the Bank's motion will be granted.

## II.   STANDARD OF REVIEW

In reviewing a party's motion for summary judgment, this Court is mindful that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the case."   N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine dispute" exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists. Id. Finally, in considering the motion for summary judgment filed by the defendant, the Court must view the pleadings and materials presented in the light most favorable to the plaintiff as the non-movant and must draw all reasonable inferences in the plaintiff's favor as well. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.  FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiffs, the following is a summary of the relevant facts.

The Plaintiffs first heard about Grey Rock during a Home and Garden Television program featuring the 2006 HGTV Dream Home in early 2006. [Doc. 34-3, Deposition of Randall Parker ("R. Parker Dep.") at 23]. Mr. Parker reached out to the Developer and arranged to visit Grey Rock. [Id. at 25]. On March 22, 2006, the Plaintiffs received a personal tour of Grey Rock from the Developer's sales agent. [Id. at 27, 29, 37; Doc. 34-4, Deposition of Michele Parker ("M. Parker Dep.") at 15, 16-18]. The Developer provided the Plaintiffs with "a standard sales packet that had local area information." [Doc. 34-3, R. Parker Dep. at 30]. The materials did not mention Bank of America. [Id. at 31].

The Plaintiffs returned to the Developer's offices the following day, March 23, 2006, and signed the Purchase Agreement for Lot 542. [Id. at 37–38; Doc. 34-6, Purchase Agreement]. No one from the Bank had any interaction with Plaintiffs throughout their two-day Grey Rock visit. [Doc. 34-3, R. Parker Dep. at 30-31]. At the time they signed the Purchase Agreement, the Developer gave Plaintiffs a list of seven or eight potential lenders, of which Bank of America was one of the listed lenders. [Id. at 49]. The Plaintiffs admit that, prior to entering into the Purchase Agreement, they did not obtain an appraisal of the Lot, do any internet research regarding the value of the Lot, or examine any comparable sales to

4

determine the Lot's value. [Doc. 34-5, Plaintiffs' Responses to First Requests for Admission at ¶4; Doc. 34-3, R. Parker Dep. at 46-47]. Prior to signing the Purchase Agreement, a representative of the Developer asked if the Parkers wanted to inspect the Lot again, but they declined. [Doc. 34-3, R. Parker Dep. at 45–46]. The Parkers did not return to Grey Rock at all after purchasing the Lot. [Doc. 34-5, Plaintiffs' Responses to First Requests for Admission at ¶¶12-13].

The Plaintiffs contend that the Developer told them that it would build roads, clubhouses, stables, and other infrastructure in the development. [Doc. 34-3, R. Parker Dep. at 42-43]. The Plaintiffs understood that the Bank was not responsible for any of this infrastructure. [Id. at 43-44]. Indeed, the Purchase Agreement states that the Developer — not Bank of America —would provide paved roads, electric service lines, telephone lines, and water service lines. [Doc. 34-6, Purchase Agreement at ¶9]. The Purchase Agreement also expressly states that the Developer "does not guarantee the construction of any other proposed amenities or facilities within or adjacent to [Grey Rock]." [Id. at ¶10]. Bank of America is not a signatory to the Purchase Agreement. [See id.].

Prior to purchasing the Lot, the Plaintiffs did not receive any information from the Bank regarding Grey Rock, attend any events

attended by the Bank, see the Bank's name in any advertisements, or speak with any Bank employees or representatives about Grey Rock. [Doc. 34-3, R. Parker Dep. at 50-51]. The Plaintiffs decided to finance the lot purchase with Bank of America because of their previous relationship with the Bank related to a home equity line of credit on their primary residence. [Id. at 52-53]. Approximately one week after signing the Purchase Agreement, Mr. Parker initiated contact with Bank of America when he called to apply for a loan to fund the purchase. [Id. at 53].

About a month after the Parkers first contacted the Bank, Marie Sladky called them to ask whether they intended to move forward with their loan application. [Id. at 57-58]. They did nothing further. [Id. at 58]. Then, in June 2006, Sladky contacted them again to ask what they intended to do. [Id. at 58-59]. Sladky told the Parkers that they should try to lock in their interest rate, and that they might lose out on buying the Lot if they waited too long given the high demand for lots at Grey Rock. [Id.]. Sladky also told Mr.

Parker "that Phase IV [of Grey Rock] would open within months," thus increasing the value of the lots. [Id. at 62]. The Parkers admit, however, that they did not engage the Bank to provide them with advice on investing in the lot. [Id. at 69].

In August and September 2006, Sladky and Mr. Parker exchanged several phone calls and voicemails. Sladky stated that she could close the loan very quickly, which was imperative to take advantage of the incredible deals at Grey Rock, which she described as a great investment opportunity. She claimed that buyers were lining up to buy Phase III lots and stated that the Bank was proud to be associated with Land Resource and to be a major lender in Grey Rock.  [Doc. 36-8; Plaintiffs' Rule 26 Initial Disclosures at 2-4].  When the Parkers expressed reservations about going forward with their purchase and questioned the Bank about its due diligence on the project, Sladky assured them that the Bank's in-house appraisers analyzed recent real estate sales and determined Grey Rock prices were in line with market area sales based on Rutherford County tax assessments and that, once buyers went to contract, the Bank used local appraisers to provide valuations so that the Parkers could feel confident the lot they were buying was well priced.  She further explained that the developer had pre-planned price increases for each phase of the development so that the Parkers' Phase III lot would automatically be worth more when Phase IV lots were released in a few months.  Sladky said that Grey Rock was a great short term investment with potential to make higher profits compared to other investments because lot prices in new

communities rose quickly in short periods of time and early buyers such as the Parkers benefitted from those increases. Sladky also told the Parkers that the purchase price for Lot 542 was a good deal based on other Grey Rock loans the Bank was financing. [Id.].

Sladky told the Parkers that once documents were provided to complete a loan, it was urgent that they close as soon as possible. She warned that if they did not close within one week, the rate lock would expire and that she knew the developer had multiple buyers even at higher prices lined up for Lot 542. [Id.]. Sladky encouraged the Parkers to get this done because she did not want the loan process to get in the way of a good investment. She warned that if they did not close immediately, that they were at risk of losing their deposit on the property. [Id.].

From July 24 through August 5, 2006, Bank of America and Land Resource representatives exchanged emails to try to secure a closing on the Parkers' lot purchase. Marie Fox, the Land Resource closing coordinator, freely exchanged comments with bank representatives about the Parkers' position. In an email to Fox, Earl Oxendine of the Bank told her that Mr. Parker "has been conditioned to 80% LTV. I am waiting for him to get back with me to let me know if he wants to move forward." [Doc. 36-9, Bank of America and Land Resource Email Thread]. Fox then forwarded

the email thread with the banker to her sales agent "to see if he can push him along." [Id.]. Oxendine described having "shot [Mr. Parker] an email this morning asking for his decision. Have not heard anything. Will keep you posted," to which Fox replied, "thanks." [Id.].

The Plaintiffs executed the Note and Deed of Trust on or about October 6, 2006 in Virginia. [Doc. 34-7, Adjustable Rate Note; Docs. 34-8 and 34-9, Deed of Trust]. At no point did the Bank interfere with the Plaintiffs' ability to perform due diligence into their investment. [Doc. 34-3, R. Parker Dep. at 78; Doc. 34-5, Plaintiffs' Responses to First Requests for Admission at ¶17].

The Plaintiffs claim, however, that they relied on the Bank to order an appraisal during the underwriting process, and that they "trusted the bank to hire an appraiser familiar with the area." [Doc. 34-5, Plaintiffs' Responses to First Requests for Admission at ¶ 4]. The Plaintiffs admit that they never reviewed any appraisal performed as part of Bank of America's underwriting procedures prior to signing the Purchase Agreement. [Id. at ¶6].

The Plaintiffs became concerned about their investment in the summer of 2007 when additional phases of Grey Rock did not proceed and they heard that the Developer had gone out of business. [Doc. 34-3, R.

Parker Dep. at 68, 82-83].  As a result, the Plaintiffs participated in telephone conferences with other Grey Rock buyers regarding their concerns with the Grey Rock properties and eventually sued the Developer in August 2008.  [Id. at 8, 89–91; see Goetz v. Land Resource, No. 6:08-cv-1471 (M.D. Fl. Filed Aug. 26, 2008)].

As previously noted, the Plaintiffs initiated the present suit as part of a mass action with other borrower-plaintiffs on December 8, 2011.  Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011).

## IV.  DISCUSSION

### A.  Statute of Limitations

In the present case, the Plaintiffs assert claims for fraud, violations of Chapter 75, and violations of ILSA.  Under North Carolina law, the statute of limitations applicable to fraud claims is three years.  See N.C. Gen. Stat. § 1-52(9).  This three-year statute of limitations begins to run "from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence."  Hunter v. Guardian Life Ins. Co., 162 N.C. App. 477, 485, 593 S.E.2d 595, 601, disc. rev. denied, 358 N.C. 543, 599 S.E.2d 48 (2004) (citation omitted).

Claims under Chapter 75 are subject to a four-year statute of limitations.  See N.C. Gen. Stat. § 75-16.2.  While a Chapter 75 claim

generally accrues when the violation of the statute occurs, see Jones v. Asheville Radiological Group, PA, 134 N.C. App. 520, 527, 518 S.E.2d 528, 533 (1999), rev'd in part on other grounds, 351 N.C. 348, 524 S.E.2d 804 (2000), where the claim is based on fraudulent conduct, courts have determined that the cause of action arises at the time that the fraudulent conduct was discovered or should have been discovered with the exercise of due diligence. See, e.g., Faircloth v. Nat'l Home Loan Corp., 313 F.Supp.2d 544, 553-54 (M.D.N.C. 2003), aff'd, 87 F. App'x 314 (2004).

Finally, ILSA claims are subject to a three-year statute of limitations. See 15 U.S.C. § 1711. The accrual date of an ILSA claim, however, depends on the particular type of claim being asserted. For example, for an alleged violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C)[1], the statute of

---

[1] Subsections (A)-(C) of § 1703(a)(2) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property:

(A) to employ any device, scheme, or artifice to defraud;

(B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; [or]

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser[.]

limitations expires "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2). The statute of limitations for an alleged violation of § 1702(a)(2)(D)[2] expires three years after the date of signing of the contract of sale. See 15 U.S.C. § 1711(a)(1). This limitations period, however, may be subject to equitable tolling if the plaintiffs can demonstrate "(1) that they exercised due diligence to discover their cause of action before the limitations period ran; and (2) that the defendant committed an affirmative act of fraudulent concealment to frustrate discovery despite due diligence." Orsi v. Kirkwood, 999 F.2d 86, 89 (4th Cir. 1993); Lukenas v. Bryce's Mountain Resorts, Inc., 538 F.2d 594, 597 (4th Cir. 1976); Dexter v. Lake Creek Corp., No. 7:10-CV-226-D, 2013 WL 1898381, at *4 (E.D.N.C. May 7, 2013).

Generally, under North Carolina law, the issue of "when fraud should be discovered in the exercise of reasonable diligence is a question of fact for the jury." State Farm Fire and Cas. Co. v. Darsie, 161 N.C. App. 542,

---

15 U.S.C. § 1703(a)(2)(A)-(C).

[2] Section 1703(a)(2)(D) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property, "to represent that roads, sewer, water, gas, or electric service or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed." 15 U.S.C. § 1703(a)(2)(D).

548 S.E.2d 391, 397 (2003). Where, however, "the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of reasonable diligence is established as a matter of law." Drinkard v. Walnut Street Sec., Inc., No. 3:09-cv-66-FDW, 2009 WL 1322591, at *2 (W.D.N.C. May 11, 2009) (citation omitted).

Here, viewing the forecast of evidence in the light most favorable to the Plaintiffs, the Court concludes that the undisputed forecast of evidence demonstrates that the Plaintiffs' claims are time barred. The Plaintiffs claim that they were induced to purchase their property through aggressive sales tactics and misrepresentations regarding luxury amenities and development infrastructure. The Plaintiffs were clearly aware of such facts, however, at the time they initiated their lawsuit against the developer in August 2008, as that lawsuit also involves allegations that they were induced to purchase the same property through aggressive sales tactics and misrepresentations regarding the status of the development. At the very least, then, the Plaintiffs' ILSA and fraud claims were barred on or before August 26, 2011, months before the Plaintiffs filed the present lawsuit against the Bank.

The Plaintiffs contend that their knowledge of wrongdoing on the part of the *Developer* does not equate to knowledge of the *Bank's* involvement in the alleged fraud. Even assuming that this is true, however, the Plaintiffs have failed to establish that they acted with reasonable diligence to discover the underlying facts supporting any of their claims against the Bank prior to the expiration of the applicable statutes of limitation. The Plaintiffs executed the Purchase Agreement for the Lot on March 23, 2006 and took possession of their Lot upon closing on October 6, 2006, yet they waited over five years to initiate this action. The Plaintiffs admit that they became concerned about their investment in the summer of 2007 – more than four years before filing the present action -- when additional phases of Grey Rock did not proceed and they heard that the Developer had gone out of business. Yet, the Plaintiffs have failed to present a forecast of evidence that they did *anything* in this interim period to discover their causes of action against the Bank, nor have they shown that the Bank committed any affirmative act of fraudulent concealment to frustrate discovery despite their due diligence.

For all of these reasons, the Court concludes that the Plaintiffs' claims are time-barred.

**B.    ILSA Claim**

Even assuming that the Plaintiffs' claims are not time-barred, the Plaintiffs' claims under the ILSA are also subject to dismissal because the Plaintiffs have failed to present a forecast of evidence that Bank of America is a "developer" or "agent" within the meaning of the Act or that Bank of America engaged in a scheme to defraud the Plaintiffs during the lot purchase.

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976). "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." Burns v. Duplin Land Dev., Inc., 621 F.Supp.2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; see also Burns, 621 F.Supp.2d at 301. A "developer" is defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. . . ." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents,

or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Generally speaking, a lending institution acting in the ordinary course of its business is not considered a "developer" within the meaning of the ILSA.  See Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases); Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc., 757 F. Supp. 698, 702 (W.D. Va. 1990).  "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or sale of property that liability may arise under ILSA."  Thompson v. Bank of Am., No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

As the United States District Court for the Western District of Virginia has explained:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort.  It is participating to an unacceptable degree in the marketing of the project.  It has gone beyond its function as a commercial bank to lot purchasers.

Hammar, 757 F. Supp. at 702-03.

The Fourth Circuit recently reached a similar conclusion, holding that the anti-fraud provision of the ILSA "encompasses entities that participated in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." In re Total Realty Mgmt., LLC, 706 F.3d 245, 253 (4th Cir. 2013) (finding complaint stated plausible allegations to support ILSA claim where it was alleged that marketer's representatives spoke at developer's sales seminars and disseminated its marketing materials there as well as on the developer's website).

Here, the undisputed forecast of evidence demonstrates that the Bank was not a co-developer with or agent of Land Resource. Bank of America provided no funding for the Grey Rock development. [Doc. 34-10, Affidavit of Jonathan Rainey ("Rainey Aff.") at ¶ 5]. Further, Bank of America did not sell the lot to the Plaintiffs and was not a party to the Purchase Agreement. Indeed, the undisputed forecast of evidence before the Court demonstrates that the Plaintiffs did not even have any contact with a Bank representative until *after* they had already signed their Purchase Agreement.

To the extent that the Plaintiffs contend that the Bank engaged in marketing activities on behalf of the developer, the Plaintiffs have failed to

present a forecast of evidence that the alleged representations went beyond the ordinary course of dealing with a bank selling loan products to interested customers. In fact, the Plaintiffs have not presented any forecast of evidence that Bank of America engaged in any marketing of *Grey Rock*, as opposed to the loan products it offered to Grey Rock purchasers.

The Plaintiffs also argue that because they never received a HUD property report from Land Resource, as required by the ILSA, they had the right to rescind the Purchase Agreement. The Plaintiffs contend that Sladky's alleged misrepresentations somehow prevented them from subsequently rescinding their Purchase Agreement within the statutory two-year period. <u>See</u> 15 U.S.C. § 1703(c). Notably, the Plaintiffs do not allege such a claim in their Complaint regarding a violation of the ILSA, 15 U.S.C. § 1703(a)(1)(B). Notwithstanding such argument, however, the Plaintiffs have not presented any forecast of evidence that the Bank was aware that the Plaintiffs had not received a Property Report or that it misrepresented any material facts in order to induce the Plaintiffs to refrain from rescinding the purchase agreement on this basis. In any event, this argument is belied by the Purchase Agreement itself, wherein the Plaintiffs specifically certified that they had received copies of the Property Report. Accordingly, to the extent that the Plaintiffs attempt to argue that the Bank induced them

to forego a statutory right to revoke the Purchase Agreement, this argument fails.

For all of these reasons, the Court concludes that the Bank was not a "developer" or "agent" of Grey Rock within the meaning of the ILSA. Accordingly, the Plaintiffs' claims under the ILSA are dismissed.

## C. Fraud Claim

In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party. Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007). Additionally, the party must demonstrate any reliance on the false representations was reasonable. See id. "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." Cobb v. Penn. Life Ins. Co., 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011).

The conversations the Plaintiffs had with Sladky in the course of securing financing for their lot purchase do not support a claim of fraud. First, most of Sladky's representations amount to nothing more than expressions of opinions regarding the value or quality of the property as a

potential investment. "A representation which is nothing more than an opinion as to the value of property, absent something more, does not constitute actionable fraud." Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984). North Carolina law recognizes an exception to the general rule that statements of opinion are not actionable "if, at the time [the statement of opinion] is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwich v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999). The Plaintiffs, however, have failed to present a forecast of evidence that Sladky made any of the aforementioned statements while holding a contrary opinion.

To the extent that the Plaintiffs claim to have been misled by Sladky's representations regarding the high demand for Grey Rock lots, the Plaintiffs have failed to present a forecast of evidence that such statements were actually false. The Plaintiffs also contend that Sladky failed to warn them about "a sedimentation issue affecting Grey Rock." [Doc. 36 at 5]. The Plaintiffs, however, have failed to present a forecast of evidence that Sladky or Bank of America were aware of any such sedimentation issues at the time. Furthermore, to the extent that the Plaintiffs claim to have been

misled by Sladky's representations that the lot would increase in value over time and that they would be able to re-sell their lot before the loan period expired, such representations "'are not regarded as fraudulent in law,' since they are not misrepresentations of a 'subsisting fact.'" Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 530 (E.D.N.C. 1985) (citation omitted).

Even if any of Sladky's statements were actionable, no reasonable fact-finder could infer from the forecast of evidence presented that the Plaintiffs actually relied upon these opinions in purchasing the property. The Plaintiffs already had entered into the purchase agreement for the property when they had the conversations with Sladky in which she supposedly made the alleged misrepresentations. Thus, they were already committed to purchasing the lot when Sladky made the alleged misrepresentations. For these reasons, the Court concludes as a matter of law that Sladky's statements could not have been the cause of the Plaintiffs' harm. See Carty v. Westport Homes of N.C., Inc., 472 F. App'x 255, 259 (4th Cir. 2012) (citing Shortridge v. Platis, 458 N.E.2d 301, 304 (Ind. Ct. App. 1984) ("There can be no recovery in fraud for a deception by which a person is induced to do something which he is already bound to do.").

Even if the Plaintiffs could show that they relied on such statements in deciding to proceed to closing, however, such reliance was unreasonable as a matter of law. "North Carolina courts consistently have held that exaggerated representations by a seller as to property's value are mere 'puffery' on which a buyer is not entitled to rely." Stephen Dilger, Inc. v. Meads, No. 5:11–CV–42–FL, 2011 WL 1882512, at *7 (E.D.N.C. May 17, 2011) (citing Horton v. Humble Oil & Refining Co., 255 N.C. 675, 680, 122 S.E.2d 716, 720 (1961) ("Representations which merely amount to a statement of opinion go for nothing. One who relies on such affirmations made by a person whose interest might prompt him to invest the property with exaggerated value does so at his peril, and must take the consequences of his own imprudence.")). Since such expressions are not actionable as against a seller, they are certainly not actionable against some third party, who made such statements after the purchase agreement was already executed.

As the Fourth Circuit has noted, reliance on "booster" statements of enthusiastic agents is unreasonable because such statements "are to be expected." See Glaser v. Enzo Biochem, Inc., 126 F. App'x 593, 603 (4th Cir. 2005) (citation omitted) (Wilkinson, C.J., concurring in part and dissenting in part). The Plaintiffs contend that Sladky's statements are

distinguishable because her statements were made not in course of promoting of the Bank's loan products but rather were made in course of promoting the *developer's* product, that is, the Grey Rock development, and that she made such statements with "seeming objectivity." [Doc. 36 at 20]. At bottom, however, Sladky was engaged in the marketing of one thing: the Bank's financial services. That she appeared to affirm and approve of the Plaintiffs' *prior* decision to purchase in Grey Rock does not change this fact.

Further, it was unreasonable for the Plaintiffs to rely on Sladky's opinions when the Purchase Agreement expressly warned the Plaintiffs:

> **Disclaimer:** Seller and Purchaser acknowledge that they have not relied upon the advice or representation, if any, of Broker (or Broker's associated salespersons) relative to any consequences of this agreement and the sale of the Property, the purchase and ownership of the Property, the condition of the Property, the availability of utilities to the Property, or the investment potential or resale value of the Property. Seller and Purchaser both acknowledge that if such matters are of concern to them, they have sought and obtained independent advice. Purchaser acknowledges that Broker (or Broker's associated salespersons) are representatives of the Seller and are not acting by or for Purchaser in any capacity).

[See, e.g., Purchase Agreement, Doc. 34-6 at ¶ 25].

Finally, the Plaintiffs' claim of reliance is unjustified because they had ample opportunity to conduct an independent investigation of the property and reach their own conclusions about the development and its risks prior to purchasing the property but failed to do so. As the North Carolina Court of Appeals has explained:

> In cases involving the purchase of real property, "[r]eliance is not reasonable if a plaintiff fails to make any independent investigation" unless the plaintiff can demonstrate: (1) "it was denied the opportunity to investigate the property," (2) it "could not discover the truth about the property's condition by exercise of reasonable diligence," or (3) "it was induced to forego additional investigation by the defendant's misrepresentations."

Sunset Beach Dev., LLC v. AMEC, Inc., 196 N.C. App. 202, 209, 675 S.E.2d 46, 52 (2009) (quoting RD & J Properties v. Lauralea–Dilton Enters., LLC, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004)). Here, the parties were engaged in an arm's length transaction. The Plaintiffs were sophisticated investors, seeking to "flip" the property in a relatively short period of time for a profit. Significantly, the Plaintiffs have not presented a forecast of evidence to suggest that the Bank denied them the opportunity to inspect the property or that they were otherwise induced to forego additional investigation as a result of Sladky's representations.

In this respect, this case is easily distinguishable from <u>Phelps-Dickson Builders, L.L.C. v. Amerimann Partners</u>, 172 N.C. App. 427, 617 S.E.2d 664 (2005), a case relied on by the Plaintiffs.  In that case, the plaintiff, a builder, entered into a contract with the defendant, a developer, to buy lots and build model homes based on the developer's representations about there being solid contracts to purchase lots in the subdivision, presales, and eager buyers.  <u>Id.</u> at 429, 617 S.E.2d at 666. When those representations turned out to be false, the builder sued, asserting, among other things, claims of fraud and unfair and deceptive trade practices.  <u>Id.</u> at 432, 617 S.E.2d at 667. The trial court granted the developer summary judgment, but the Court of Appeals reversed.  In so holding, the Court of Appeals concluded that there was a genuine issue of fact as to whether the builder's reliance was reasonable because the builder had an inferior opportunity to investigate the developer's representations as that information was exclusively in the control of the developer and could not otherwise be readily or easily verified. <u>Id.</u> at 437-39, 617 S.E.2d at 670-71.

By contrast, in the present case, the Plaintiffs have failed to present any forecast of evidence to establish that the Bank held any superior knowledge regarding the wisdom of investing in the undeveloped lots in

Grey Rock. Moreover, the Plaintiffs have failed to present anything to indicate that information regarding the development was exclusively in the control of the Bank and could not have been readily verified by the Plaintiffs. Indeed, the Plaintiffs had many means available to them to assess the value and condition of the property at issue, including independent appraisals, comparable sales data, and personal inspections of the property. The Plaintiffs, however, chose to forego any independent investigation of their investment prior to purchase. Under these circumstances, the Bank cannot be held liable for the Plaintiffs' failure to conduct their own due diligence.

Further, the Plaintiffs' asserted reliance was unjustified because their relationship with the Bank was contractual and did not give rise to a fiduciary duty to ensure that the Plaintiffs were making a sound investment. See In re Fifth Third Bank, Nat'l Ass'n–Village of Penland Litig., 217 N.C. App. 199, 212, 719 S.E.2d 171, 180 (N.C. Ct. App. 2011) (noting that borrowers "cited no authority tending to establish that [the lender] had a legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to [the borrowers] the results of any such investigation or any other deficiencies associated with the [development]."), cert. denied, 731 S.E.2d 687 (2012); Camp v.

<u>Leonard</u>, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party").[3]

For all of these reasons, the Court concludes that the Bank is entitled to summary judgment on the Plaintiffs' fraud claim.

### D. Chapter 75 Claim

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." <u>Spartan Leasing, Inc. v. Pollard</u>, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). A deceptive practice is one that has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required." <u>Id.</u> at 461, 400 S.E.2d at 482.

To the extent that the Plaintiffs' Chapter 75 claim is derivative of their claims for fraud and violations of the ILSA, such claim also fails for the

---

[3] To the extent that the Plaintiffs base their fraud claim on the Bank's use of allegedly inflated appraisals, the Plaintiffs have not presented any forecast of evidence to suggest that the Bank had any knowledge that the appraisals were incorrect or false in any way. Moreover, the Plaintiffs have offered no forecast of evidence that they relied on these appraisals in purchasing their property. Indeed, neither of the Plaintiffs even saw an appraisal before entering into the purchase agreement.

reasons set forth above.  See SilverDeer, LLC v. Berton, No. 11 CVS 3539, 2013 WL 1792524, at *10 (N.C. Super. Ct. Apr. 24, 2013) (citing Governor's Club, Inc. v. Governors Club Ltd. P'ship, 152 N.C. App. 240, 255, 567 S.E.2d 781 (2002)).

The Plaintiffs contend that the Bank violated Chapter 75 by "align[ing] itself with the developer, promoting Grey Rock as an investment, and creating loan programs around it."  [Doc. 36 at 23].  The Plaintiffs' assertions that the Bank should be held liable for its close association with Land Resource, however, are insufficient to state a claim under Chapter 75 absent a forecast of evidence that the Bank was an actual or apparent agent of the developer.  See In re Fifth Third Bank, 217 N.C. App. at 211-12, 719 S.E.2d at 179-80 (dismissing Chapter 75 claim based on allegations that lender "gave an air of legitimacy to the Penland development by virtue of its involvement in the developers' lot sales program" and that lender clearly "had an agreement or working relationship with the developers with respect to the Penland lot loans.").

The Plaintiffs appear to have abandoned their Chapter 75 claim to the extent that such claim was based on a theory that the use of inflated appraisals by the Bank as part of its loan underwriting process constitutes an unfair or deceptive trade practice.  Even if the Plaintiffs were to pursue

this theory, however, their claims would nevertheless be subject to dismissal as the undisputed forecast of evidence demonstrates that the Plaintiffs did not even see an appraisal prior to closing and, in any event, their Purchase Agreement was not dependent on such appraisal. As such, the Plaintiffs could not have reasonably relied on the appraisal in proceeding with their lot purchase. See In re Fifth Third Bank, 217 N.C. App. at 211, 719 S.E.2d at 179 ("Thus, given the complete absence of any evidence tending to show a causal connection between the allegedly defective appraisals and the injury that Plaintiffs claim to have suffered, we conclude that the allegedly defective appraisals do not support a finding of liability pursuant to [Chapter 75].").

Finally, the Plaintiffs cannot establish an unfair or deceptive act based on the Bank's ostensible failure to prevent them from finalizing their lot purchase during the origination and underwriting process. The Bank's role in this transaction was to provide financing; it had no contractual duties to the Plaintiffs outside of that role. See Camp, 133 N.C. App. at 560, 515 S.E.2d at 913. The Bank had no obligation to advise the Plaintiffs regarding the quality of the investment for which they sought financing. See In re Fifth Third Bank, 217 N.C. App. at 213, 719 S.E.2d at 180 (noting that lender has no "legal duty to investigate and monitor the activities of the

developers and the progress of the development or to communicate to Plaintiffs . . . any other deficiencies associated with the [development]").[4]

In sum, the Plaintiffs have not presented any forecast of evidence establishing that the Bank committed any unfair or deceptive action during the Plaintiffs' lot purchase. Accordingly, the Court concludes that the Bank is entitled to summary judgment on the Plaintiffs' claim under Chapter 75.

## V.    CONCLUSION

For the foregoing reasons, the Court finds that there are no genuine disputes of any material fact and that the Defendant is entitled to judgment as a matter of law.

---

[4] Because the Court concludes that the Plaintiffs' Chapter 75 claim should be dismissed on the merits, the Court need not address the Bank's argument that the Plaintiffs' place of residence outside of the State of North Carolina precludes their recovery under Chapter 75.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 34] is **GRANTED**, and this action is hereby **DISMISSED**.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Martin Reidinger
United States District Judge